AO 106 (Rev. 04/10) Application for a Search Warrant

**FILED**

# UNITED STATES DISTRICT COURT

for the

Southern District of California

SEP − 6 2019

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                                    DEPUTY

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

(2) One Apple iPhone 6,
IMEI: 355409077098881,
(Target Device #2)

)
)
)
)
)
)

Case No. **19MJ3806**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2 (incorporated herein)

located in the _____ Southern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-2 (incorporated herein)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Secs. 952, 960, and 963; Secs. 841 and 846, and Sec. 843(b); 18 U.S.C. Sec. 2 | Import. of CS ( and Conspiracy); Distribution and Poss. with Intent to Distr. CS (and Conspiracy); Unlawful Use of a Communication Facility; Aiding and Abetting |

The application is based on these facts:

See attached Affidavit (incorporated herein)

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Justin Trujillo, HSI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 9/6/19

_____
*Judge's signature*

City and state: San Diego, California

Hon. Barbara L. Major, U.S. Magistrate Judge
*Printed name and title*

1
2
3
4
5
6
7
8

## UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10  IN THE MATTER OF THE SEARCH OF

**AFFIDAVIT OF SPECIAL AGENT JUSTIN TRUJILLO IN SUPPORT OF A SEARCH WARRANT**

11  (1) One Apple iPhone XR,
Seized under FP&F Number
12  2019-2504-0015101
**(Target Device #1)**; and

13
(2) One Apple iPhone 6,
14  IMEI: 355409077098881,
**(Target Device #2)**

15
16
17        I, Special Agent Justin Trujillo, having been duly sworn, declare and state as follows:

18                                              **I.**

19                                  **INTRODUCTION**

20        1.      I make this affidavit in support of an application for a warrant to search the

21  following electronic devices:

22                        Apple iPhone XR
                          Seized under FP&F Number
23                        2019-2504-0015101
                          **(Target Device #1)**

24
                          Apple iPhone 6
25                        IMEI: 355409077098881
                          **(Target Device #2)**
26                        (collectively, the **Target Devices**)

27  and seize evidence of crimes, specifically violations of Title 21, United States Code,

28  Sections 952, 960, and 963, Unlawful Importation of a Controlled Substance (and

1  Conspiracy to do the same); Title 18, United States Code, Section 2, Aiding and Abetting
2  the Unlawful Importation of a Controlled Substance; Title 21, United States Code, Sections
3  841 and 846, Distribution and Possession with Intent to Distribute Controlled Substances
4  (and Conspiracy to do the same) and Title 21, United States Code, Section 843(b),
5  Unlawful Use of a Communication Facility (the **Target Offenses**).

6        2.      The **Target Devices** were seized from Defendant Jose Alejandro Olivera Jr.
7  (Defendant) at the time of his arrest for Importation of Methamphetamine on June 12, 2019,
8  at the San Ysidro Port of Entry. The **Target Devices** were found in Defendant's vehicle at
9  the time of his arrest. The **Target Devices** are currently in the possession of Homeland
10 Security Investigations, 9495 Customshouse Plaza, San Diego, CA 92154.

11       3.      The search of the **Target Devices** supports an investigation and prosecution
12 of Defendant for the Target Offenses. Based on the information below, there is probable
13 cause to believe that a search of the **Target Devices**, as described in Attachments A-1 and
14 A-2 will produce evidence of the Target Offenses, as described in Attachment B-1 and B-
15 2.

16       4.      The following is based upon my experience and training, investigation, and
17 consultation with other law enforcement agents and officers experienced in narcotics
18 violations, including the Target Offenses. The evidence and information contained herein
19 was developed from interviews and my review of documents and evidence related to this
20 case. Because I make this affidavit for the limited purpose of obtaining a search warrant
21 for the **Target Devices**, it does not contain all of the information known by me or other
22 federal agents regarding this investigation, but only sets forth those facts believed to be
23 necessary to establish probable cause. Dates and times are approximate, and refer to Pacific
24 Standard Time (PST) unless otherwise specified.

25                                       **II**
26                      **AFFIANT'S EXPERIENCE AND TRAINING**

27       5.      I am a Special Agent (SA) with the Department of Homeland Security (DHS),
28 Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI). I

1 | have been a Special Agent with HSI since October of 2010. I am currently assigned to the
2 | ICE/ HSI San Diego Office. I have completed approximately 24 weeks of intensive training
3 | in criminal investigations at the Federal Law Enforcement Training Center in Glynco,
4 | Georgia (2010-11). Because of my training and experience as a Special Agent, I am
5 | familiar with federal criminal statues to include violations of Title 18, 21 and 8 of the
6 | United States Code. Prior to being employed by HSI, I was in the United States Coast
7 | Guard where I assisted in multiple narcotics seizures while assigned to Coast Guard cutters.

8 |      6.    During my tenure with HSI, I have participated in the investigation of
9 | numerous narcotics smuggling organizations, which have resulted in the issuance of search
10 | warrants, arrest warrants, and the indictments of persons for such crimes. In the course of
11 | my duties, I investigate and prepare for prosecution cases against individuals suspected of
12 | bringing in and transporting narcotics into the United States with the intent to distribute;
13 | and individuals suspected of transporting bulk cash derived from narcotics proceeds out of
14 | the United States.

15 |      7.    By virtue of my employment with HSI, I have performed various tasks which
16 | include, but are not limited to: functioning as a case agent, or co-case agent for
17 | investigations of narcotics smuggling organizations; functioning as a surveillance agent
18 | and thereby observing and recording the movements of persons suspected of narcotics
19 | smuggling; interviewing suspects, witnesses, and cooperating individuals with specific
20 | knowledge relevant to narcotics trafficking.

21 |      8.    I am a federal law enforcement officer within the meaning of Rule 41(a)(2)(C)
22 | of the Federal Rules of Criminal Procedure. I am authorized under Rule 41(a) to make
23 | applications for search and seizure warrants. I am authorized to investigate violations of
24 | laws of the United States and to execute warrants issued under the authority of the United
25 | States.

26 |      9.    I am familiar with narcotics traffickers' methods of operation including the
27 | distribution, storage, and transportation of narcotics and the collection of money proceeds
28 | of narcotics trafficking and methods of money laundering used to conceal the nature of the

1   proceeds. I have had training in investigations regarding the unlawful importation,
2   possession, and distribution of controlled substances, as well as conspiracies associated
3   with criminal narcotics, in violation of Title 21, United States Code, Sections 952, 960 and
4   963.

5         10.    Through the course of my training, investigations, and conversations with
6   other law enforcement personnel, I have learned that it is a common practice for narcotics
7   smugglers to work in concert with other individuals and to do so by utilizing cellular
8   telephones, pagers, and portable radios to maintain communications with co-conspirators
9   in order to further their criminal activities. Conspiracies involved in the smuggling and
10  trafficking of narcotics generate many types of evidence including, but not limited to,
11  cellular phone-related evidence such as voice-mail messages referring to the arrangements
12  of travel and payment, names, photographs, text messaging, and phone numbers of co-
13  conspirators. Typically, load drivers smuggling narcotics across the border from Mexico
14  into the United States are in telephonic contact with co-conspirators immediately prior to
15  and following the crossing of the load vehicle, at which time they receive instructions on
16  where and when to deliver the controlled substances.

17        11.    Based upon my training and experience as a Special Agent, and consultations
18  with law enforcement officers experienced in narcotics trafficking investigations, and all
19  the facts and opinions set forth in this affidavit, I submit the following:

20          a.    Drug traffickers will use cellular/mobile telephones because they are
21  mobile and they have instant access to telephone calls, text, web, and voice messages.

22          b.    Drug traffickers will use cellular/mobile telephones because they are able
23  to actively monitor the progress of their illegal cargo while the conveyance is in transit.

24          c.    Drug traffickers and their accomplices will use cellular/mobile
25  telephones because they can easily arrange and/or determine what time their illegal cargo will
26  arrive at predetermined locations.

27          d.    Drug traffickers will use cellular/mobile telephones to direct drivers to
28  synchronize an exact drop off and/or pick up time of their illegal cargo.

e.     Drug traffickers will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

f.     Drug traffickers and their co-conspirators often use cellular/mobile telephones to communicate with load drivers who transport their narcotics and/or drug proceeds.

g.     The use of cellular telephones and other mobile communication devices by conspirators or drug traffickers tends to generate evidence that is stored on the device, including, but not limited to emails, text messages, photographs, audio files, videos, call logs, address book entries, IP addresses, social network data, and location data.

12.     Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that device.

13.     Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I have learned that cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, based upon my training, education, and experience investigating these conspiracies, I have learned that searches of cellular/mobile telephones and/or other mobile communication devices yields evidence:

a. tending to indicate efforts to import methamphetamine, or other federally controlled substances from Mexico into the United States, and to distribute methamphetamine or other federally controlled substances within the United States;

b. tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the importation of methamphetamine, or other federally controlled substances, from Mexico into the United States, and the distribution of methamphetamine, or other federally controlled substances, within the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in the importation of methamphetamine, or other federally controlled substances, from Mexico into the United States, and the distribution of methamphetamine, or other federally controlled substances, within the United States;

d. tending to identify travel to or presence at locations involved in the importation of methamphetamine, or other federally controlled substances from Mexico into the United States, and the distribution of methamphetamine, or other federally controlled substances, within the United States;

e. tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## III

## STATEMENT OF PROBABLE CAUSE

**A. DEFENDANTS' ARREST**

14. On June 12, 2019, at around 2:58 a.m., Defendant Jose Alejandro Olivera Jr. applied for entry into the United States at the San Ysidro Port of Entry. He was the driver, sole occupant, and registered owner of a black 2014 Volkswagen Passat bearing California license plate 8ATK241.

6

15.     During this time, Customs and Border Protection Officer (CBPO) Arcia was conducting roving pre-primary inspections with his trained Human-Narcotics Detection Dog (HNDD). When CBPO Arcia screened Defendant's Volkswagen with his HNDD, the dog alerted to the vehicle's gas tank / the undercarriage on the passenger side.

16.     CBPO Jones was conducting primary inspections during this time and CBPO Arcia notified him of his HNDD's alert.

17.     When CBPO Jones contacted Defendant at primary inspection, Defendant presented a California driver's license. Defendant also provided two negative customs declarations. Defendant told CBPO Jones he was traveling to El Cajon, California.

18.     Defendant was removed from the Volkswagen Passat and escorted to the security office while his vehicle was taken to an area for secondary inspection.

19.     The Volkswagen was scanned using a Z-Portal X-ray machine and CBPO McIntosh reviewed the images. Upon reviewing the images, CBPO McIntosh identified anomalies in the gas tank area of the vehicle.

20.     In the secondary inspection lot, CBPO Godinez conducted a physical inspection of the vehicle. CBPO Godinez removed the back seat and the sending unit to gain access to the Volkswagen's gas tank. Once the sending unit was removed, CBPO Godinez could see packages floating in the gas tank. He removed one package and the substance inside field-tested positive for the properties of methamphetamine. CBPO Godinez contacted a contracted mechanic for assistance with removing the remaining packages.

21.     A total of thirty (30) packages were removed from the Volkswagen's gas tank and the packages weighed a total of approximately 14.92 kilograms (32.89 pounds). Defendant was arrested and charged with violating Title 21, United States Code, Sections 952 and 960 (Importation of Controlled Substances). The **Target Devices** were seized incident to his arrest.[1]

---

[1] The contents of the **Target Devices** were downloaded at the time of Defendant's arrest. In an abundance of caution, I ask the court not to consider information agents may or may

22.     Based on my training and experience, 14.92 kilograms (32.89 pounds) is a distributable amount of methamphetamine.

**B.     DEFENDANT'S POST-*MIRANDA* STATEMENT**

23.     After his arrest, Defendant was advised of his *Miranda* rights. He elected to waive them and make a statement.

24.     Defendant said that approximately two (2) months ago, he was out "clubbing" in Tijuana when he was pulled over by Tijuana police. Defendant said the police found a balloon of methamphetamine inside his trunk and had to pay the police officers so they would not arrest him. Defendant claimed that he believed one of his friends or cousins had left the methamphetamine inside his car on that occasion.

25.     Defendant also claimed that approximately one month ago his cousin, Oliver Olivera had asked to borrow his car. He claimed that Oliver Olivera had borrowed his car from approximately 5:00 p.m. until around 10:00 p.m. that night. Defendant said he asked Oliver Olivera where he had taken the car and he said he had gone grocery shopping. Defendant claimed he and Oliver Olivera got into an argument and this led to Oliver Olivera getting his own car. Defendant claimed Oliver Olivera had borrowed his car on numerous occasions.

26.     Defendant claimed that multiple friends and family would use his car without him present. He claimed a friend named "Paco" had borrowed the Volkswagen for around two hours. Paco was supposed to have picked up his girlfriend and a woman Defendant was "seeing" so they could all go to the movies together.

27.     Defendant claimed Paco borrowed the Volkswagen from approximately 7:40 p.m. to around 9:00 p.m., but came back and said they were no longer going to the movies because it was too late.

28.     Defendant claimed he asked Paco where he had gone and Paco responded that he went to his house to change clothes, then to his cousin's house for a birthday party, and

---

not have seen during that examination in determining whether there is probable cause for the requested warrant.

1   then to Paco's girlfriend's house before returning to Defendant's apartment. Defendant
2   claimed to have known Paco for approximately three (3) years. Defendant claimed he lived
3   alone in an apartment in a complex owned by his aunt and uncle.

4        29.     Defendant claimed he worked in the shipping and receiving department at Fox
5   Racing in El Cajon, California. Defendant claimed his cousin Oliver Olivera worked at the
6   same location and that they carpooled together before Oliver Olivera got his own car.
7   Defendant said his other cousin James Olivera worked at the same location, but on a
8   different shift.

9        30.     Defendant said the company had a gated parking lot, but he had to park on the
10   side of the road near the facility. He said his friends and family would sometimes borrow
11   his car while he was at work. He claimed there were not functioning security cameras near
12   his work.

13        31.     Defendant said there were only one set of keys for the vehicle. He also claimed
14   that the trunk could be opened without the keys due to a recent accident. However, HSI
15   Agents and CBP Officers tried multiple methods to open the trunk without the keys and
16   the lock appeared to function as it should.

17        32.     Defendant claimed that Oliver Olivera or his uncle had taken the Volkswagen
18   in for maintenance approximately two months earlier and the car had smelled like
19   marijuana when they returned it. Defendant further claimed that he had noticed the gas
20   gauge needle would sometimes get stuck. He said this issue started approximately one
21   month earlier.

22        33.     Defendant claimed ownership of both the **Target Devices** during his
23   interview.

24   **C.    DEFENDANT'S BORDER CROSSING HISTORY**

25        34.     In 2018, Olivera only crossed the border between Mexico and the United
26   States on one occasion (June 10, 2018). During that crossing, he crossed the border in a
27   different vehicle (i.e., not the Volkswagen Passat he was driving on the day of his arrest).

28

35.   On March 12, 2019, Defendant began crossing the border much more frequently. He crossed the border from Mexico into the United States more than 50 times between March 12 and June 12 of 2019. The vast majority of these crossings were in the Volkswagen Passat he was driving on the day of his arrest.

36.   Between March 18 and May 3 of 2019, other individuals drove the Volkswagen Passat across the border into the United States—without Defendant present— on eight occasions.

37.   Based on my experience investigating narcotics smugglers, Defendant may have used the **Target Devices** to coordinate with the other parties involved regarding the importation of methamphetamine. I believe that recent calls made and received, telephone numbers, contact names, electronic mail (email) addresses, appointment dates, text messages, email messages, messages and posts from social networking sites, pictures, and other digital information may be stored in the memory of the **Target Devices**. This data may include information that is relevant to Defendant's narcotics trafficking activities, including identifying other persons involved in their narcotics trafficking activities.

38.   Drug trafficking conspiracies require intricate planning and coordination. This often occurs days, weeks, or even months prior to the actual importation of the drugs into the United States. All parties involved communicate with one another in efforts to ensure success in getting their valuable cargo to its destination within the United States. Based on the sudden change in Defendant's border crossing history in March of 2019, probable cause exists to believe that evidence of the aforementioned offenses exists on the **Target Devices** for the period of March 1, 2019 to June 12, 2019.

### III

### METHODOLOGY

39.   It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as

personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode," which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

40.    Following the issuance of this warrant, I will collect the **Target Devices** and subject them to analysis. All forensic analysis of the data contained within the **Target Devices** and memory card(s) will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

41.    Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

//

//

//

# IV

## CONCLUSION

42.    Based on all of the facts and circumstances described above, my training and experience, and consultations with other law enforcement officers, there is probable cause to conclude that Defendant utilized the **Target Devices** to facilitate the commission of the Target Offenses.

43.    Further, based on the significant change in Defendant's border crossing pattern in March of 2019 and Defendant's statement that he had previously shared the car with individuals that had left methamphetamine inside of it, probable cause exists to believe that evidence of the aforementioned offenses exists on the **Target Devices** for the period of March 1, 2019 to June 12, 2019.

44.    Because the **Target Devices** were promptly seized during the investigation of Defendant's drug trafficking activities and has been securely stored, there is probable cause to believe that evidence of illegal activity committed by Defendant continues to exist on the **Target Devices**.

//
//
//
//
//
//
//
//
//
//
//
//
//

45.     Based upon my experience and training, consultation with other agents in narcotics investigations, consultation with other sources of information, and the facts set forth herein, I believe that the items to be seized set forth in Attachments B-1 and B-2 (incorporated herein) are likely to be found in the property to be searched described in Attachments A-1 and A-2 (incorporated herein). Therefore, I respectfully request that the Court issue a warrant authorizing me, or another federal law enforcement agent specially trained in digital evidence recovery, to search the items described in Attachments A-1 and A-2, and seize the items listed in Attachments B-1 and B-2.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Special Agent Justin Trujillo
Homeland Security Investigations

Sworn to and subscribed before me this _____ day of September, 2019.

HON. BARBARA L. MAJOR
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A-2

### PROPERTY TO BE SEARCHED

The property to be searched in connection with an investigation of violations of Title 21, United States Code, Sections 952, 960, and 963, Unlawful Importation of a Controlled Substance (and Conspiracy to do the same); Title 18, United States Code, Section 2, Aiding and Abetting the Unlawful Importation of a Controlled Substance; Title 21, United States Code, Sections 841 and 846, Distribution and Possession with Intent to Distribute Controlled Substances (and Conspiracy to do the same) and Title 21, United States Code, Section 843(b), Unlawful Use of a Communication Facility (the **Target Offenses**) is:

> Apple iPhone 6
> IMEI: 355409077098881
> (**Target Device #2**)

**Target Device #2** is currently in the possession of Homeland Security Investigations, 9495 Customshouse Plaza, San Diego, CA 92154.

## ATTACHMENT B-2

Authorization to search **Target Device #2** described in Attachment A-2 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in **Target Device #2** for evidence described below. The seizure and search of **Target Device #2** shall follow the search methodology described in the attached affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephone will be electronic records, communications, and data such as emails, text messages, chats, and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of March 1, 2019, to June 12, 2019:

a.   tending to indicate efforts to import methamphetamine, or other federally controlled substances from Mexico into the United States, and to distribute methamphetamine or other federally controlled substances within the United States;

b.   tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the importation of methamphetamine, or other federally controlled substances, from Mexico into the United States, and the distribution of methamphetamine, or other federally controlled substances, within the United States;

c.   tending to identify co-conspirators, criminal associates, or others involved in the importation of methamphetamine, or other federally controlled substances, from Mexico into the United States, and the distribution of methamphetamine, or other federally controlled substances, within the United States;

d.   tending to identify travel to or presence at locations involved in the importation of methamphetamine, or other federally controlled substances from Mexico into the United States, and the distribution of methamphetamine, or other federally controlled substances, within the United States;

e.   tending to identify the user of, or persons with control over or access to, the **Target Device #2**; and/or

f.   tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of the Target Offenses.